COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Decker and Senior Judge Clements
Argued by teleconference

UNPUBLISHED

THOMAS SUNGHAN KIM

MEMORANDUM OPINION[*] BY
v.      Record No. 1090-13-4         JUDGE JEAN HARRISON CLEMENTS
APRIL 22, 2014

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Lorraine Nordlund, Judge

Robert F. Horan, III (James R. Hart; Hart & Horan, P.C., on briefs),
for appellant.

Donald E. Jeffrey, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Thomas Sunghan Kim ("appellant") was convicted of unlawfully throwing or shooting a

missile into an occupied dwelling in violation of Code § 18.2-279. On appeal, he contends the

evidence was insufficient to support his conviction because it failed to prove his slingshot was a

"deadly weapon" or that his actions placed lives in peril. For the reasons that follow, we affirm his

conviction.

As the parties are fully conversant with the record in this case and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Background

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)). Philip and Joyce Henry lived in the townhome next to appellant. Mrs. Henry's early encounters with appellant in 2011 were limited and uneventful. However, as she saw him frequently in his backyard drinking for an extended period of time, she generally avoided her back deck.

In the summer of 2012, Mrs. Henry stepped out onto her back porch to tell appellant she would be moving to the townhome on the other side of him. He appeared "distant and dreamy" as if he were either "high or intoxicated." Upon Mrs. Henry informing appellant of her move, he began asking whether she was in the CIA. From that time forward, appellant questioned Mrs. Henry "constantly" about the CIA, and asked repeatedly, "Who do you work for? Who do you work for?" On one occasion, appellant rifled through Mrs. Henry's garbage cans and asked if she was "from the planet Sirius." She tried to move her belongings from one townhome to the other at night so she would not encounter him.

By September 2012, the Henrys had completed their move. On the morning of September 4, 2012, Mrs. Henry ran into appellant as she stepped outside her townhome onto the back deck. Appellant told Mrs. Henry she "look[ed] like a pig, that [her] husband wanted to divorce [her], [and] that [she] had killed four children." Mrs. Henry reassured him she had not killed four children, and advised him tree trimmers would be stopping by her home. When Mrs. Henry asked appellant if they could "be friends," he threw a lit cigarette at her. Noticing the beer bottle in appellant's hand, Mrs. Henry chided appellant not to "throw things" at her.

Appellant made a motion as if he might throw the bottle at her, but "checked himself" and threw it at the deck on the side on the house instead.

Mrs. Henry stated, "Can you just stop it? You know, this is ridiculous." Appellant looked Mrs. Henry in the eye and responded, "You're not Asian." He left the deck and went inside his townhome.

Approximately twenty minutes later, appellant returned dressed in black paramilitary gear with orange glasses like those worn at a shooting range. A giant hunting knife was dangling from a cord at appellant's side, and he was carrying what appeared to be an Asian sword in a long sheath. Appellant slammed the sword against his deck and proclaimed to Mrs. Henry, "Do you see this? Do you see this?"

Concerned, Mrs. Henry thought she should take a picture of appellant's gear. She stepped inside her townhome and returned with her cell phone. When she snapped the picture, appellant responded, "CIA, CIA lady, I know you took my picture."

Mrs. Henry reassured him the picture did not "come out," and began to think about a way to extricate herself from the situation without incident. She took his picture and complimented him on his "really cool outfit." Her words appeared to placate appellant, and he sat down to smoke a cigarette. However, he became periodically agitated, stood up and said "horrible things" to Mrs. Henry. When appellant called Mrs. Henry "the C word," she believed he had finished insulting her by saying the "worst thing he could think of at the time." He told Mrs. Henry he would be "right back" and that he was "going to go have a cup of tea."

Mrs. Henry retreated inside, grabbed her keys, and left through the front door. On her way out, she noticed the two small concrete statues flanking her entrance were missing. Mrs. Henry visited the local police station to ask the officers what she could do, and they advised

they could charge him with assault for the beer bottle incident. Mrs. Henry decided to wait for her husband to come home to discuss it with him before taking any action.

Mrs. Henry returned home shortly after 1:00 that afternoon and went to her upstairs bedroom to wait for her husband's arrival from work at 4:00 p.m. Her bedroom was located over the first floor sliding glass door to the back deck where she had encountered appellant that morning. At approximately 3:00 p.m., she heard a "kind of slamming bang sound." Speculating something had fallen over, Mrs. Henry went downstairs to investigate, but upon finding nothing out of place, went back upstairs to wait for her husband.

When Mr. Henry came home, his wife recounted the events of the day and told him she "could [still] hear things hitting the house." Mr. and Mrs. Henry walked back to the sliding glass door adjoining their rear deck. Looking outside, Mrs. Henry saw a small piece of vinyl siding on the deck. She and her husband opened the sliding glass door and stepped outside to pick up the vinyl shard. As they did, Mr. Henry noticed two small ball bearings in the cracks of the deck flooring.

Mrs. Henry told her husband they should go back inside immediately. The couple stepped through the sliding glass door, and Mr. Henry immediately shut the door behind them. He faced the sliding glass door and began closing the curtain over it. As soon as he finished closing it, he heard another "loud bang" similar to the sounds Mrs. Henry had heard when she was upstairs. Mrs. Henry directed her husband to move away from the sliding glass door. Mr. Henry moved to the window around the corner from the sliding glass door and looked outside. Appellant was standing in the middle of his deck[1] and was "gesturing with a sling shot."

---

[1] The deck behind the Henrys' townhome was not as deep as the one behind appellant's townhome, so that the Henrys had a limited line of sight to appellant's deck from inside their sliding glass door. In order to see appellant's deck, Mr. Henry had to step into a "bumped out" area of his townhome that adjoined his deck.

A short time later, the Henrys heard a "thud" and noticed that appellant had thrown an unopened pack of cigarettes. Mrs. Henry called the police, and appellant was arrested that evening. Upon examining their back deck, the Henrys found two small holes in the siding next to the exterior light beside the sliding glass door. They found no additional ball bearings.

At trial, Mr. Henry described appellant's slingshot as "a cut more sophisticated than a kid's sling shot." Based on the configuration of the decks behind each house, Mr. Henry explained that appellant could aim at the sliding glass door area only by standing at the end of the interior corner of appellant's deck. Appellant acknowledged he shot the ball bearings at the Henrys' home, but maintained he was "aiming at the light fixture" next to the sliding glass door. He estimated he was standing approximately twenty feet from the light fixture at the time he fired. He explained he had bought the slingshot in the sporting goods section of K-Mart after his mother asked him to "get rid of" the animals in her garden. Appellant testified that the slingshot was used to kill not only typical garden animals, but deer as well.

Analysis

Appellant maintains the evidence was insufficient to prove he violated Code § 18.2-279[2] because it did not establish that shooting the ball bearings at the Henrys' house may have placed his or her life in peril. He also contends the trial court erred in finding that the slingshot was a deadly weapon, thereby relieving the Commonwealth of proving that appellant's conduct may have put the Henrys' lives in peril.

---

[2] Code § 18.2-279 provides in pertinent part as follows:

> If any person . . . maliciously shoots at, or maliciously throws any missile at or against any dwelling house or other building when occupied by one or more persons, whereby the life or lives of any such person or persons may be put in peril, the person so offending is guilty of a Class 4 felony.

In reviewing the sufficiency of the evidence, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it." Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (citations omitted). Thus, we inquire only whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "[A] reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Barnes v. Commonwealth, 47 Va. App. 105, 110, 622 S.E.2d 278, 280 (2005) (quoting Stevens v. Commonwealth, 46 Va. App. 234, 249, 616 S.E.2d 754, 761 (2005) (*en banc*) (emphasis in original and citation omitted)).

Applying this standard, we conclude the evidence supports the trial court's finding that appellant violated Code § 18.2-279.

In reaching its verdict, the trial court was not required to find that appellant's actions *in fact* placed the Henrys' lives in peril. The evidence was sufficient to support a finding of guilt upon proof that firing the ball bearings at the Henrys' home *may* have placed their lives in peril. See Kirby v. Commonwealth, 264 Va. 440, 445, 570 S.E.2d 832, 835 (2002) (shooting near, but not necessarily at, intended victim was sufficient to satisfy "may be put in peril" standard of Code § 18.2-279); Dowdy v. Commonwealth, 220 Va. 114, 117, 255 S.E.2d 506, 508 (1979) (Code § 18.2-279 does not require proof that "human life was, in fact, endangered."); Strickland v. Commonwealth, 16 Va. App. 180, 182, 428 S.E.2d 507, 508 (1993) ("possibility" of ricochet from shooting firearm at ceiling of occupied room satisfied "peril" requirement of Code § 18.2-279).

Here, the evidence was undisputed that appellant fired his slingshot deliberately at the Henrys' home in the deck area where he had last interacted with Mrs. Henry. He had thrown

objects at her earlier that day, had made derogatory and accusatory comments, and had dressed himself in "combat" attire. Appellant stood as close as twenty feet from the Henrys' sliding glass door at the time he fired the ball bearings.

After the Henrys stepped outside on their deck to investigate, appellant resumed firing at the sliding glass door. He fired at head level in the direction of the sliding glass door almost immediately after Mr. Henry closed it and was drawing the vertical blinds. The shot prompted Mr. Henry to move away from the sliding glass door. When Mr. Henry looked out of a window facing appellant's deck, he saw appellant crouching in an "aiming" posture with the slingshot. Based on this evidence, the trial court was entitled to conclude appellant knew one or both of the Henrys were on the other side of the sliding glass door at the time he fired the slingshot and that he deliberately fired a ball bearing toward them at head level.

Furthermore, the trial court was entitled to find that appellant's slingshot was a weapon, as opposed to a toy. Mr. Henry described it as "more sophisticated" than the slingshot he had used as a boy, and appellant acknowledged he had purchased it in the sporting goods department to "get rid of" animals. When appellant fired ball bearings at the Henrys' home, they struck it with sufficient force to pierce the siding.

Based on this evidence, the trial court could rationally conclude that the ball bearings, fired from the type of slingshot used by appellant, had the capacity to place the Henrys' lives at

risk. Accordingly, we conclude the evidence was sufficient to satisfy the statutory peril

requirement in Code § 18.2-279.[3]

Affirmed.

---

[3] Because the evidence was sufficient to prove beyond a reasonable doubt that appellant's actions may have placed the Henrys' lives in peril, we need not reach the issue of whether the trial court's finding that the slingshot was a "deadly weapon" obviated the need to prove the Henrys' lives were placed in peril. See Dowdy, 220 Va. at 117, 255 S.E.2d at 508 (proof that deadly weapon has been maliciously discharged at an occupied building "relieves the Commonwealth of the burden of proving that human life was, in fact, endangered").